Good afternoon, Your Honor. May it please the court. I am Jerome Matthews, Federal Public Defender's Office, on behalf of Mr. Vandergroen. I'd like to reserve five minutes for rebuttal. It is our position that this case, the outcome in this case, is governed by this court's recent decision in United States v. Brown. The law on anonymous tips, such as happened here, is well established. One, they must be reliable. Two, they must provide information regarding illegal activity. And this court's decision in Brown held specifically that an identified caller reporting second-hand information about a person with a gun, which is precisely the set of circumstances present in this case, is effectively an anonymous tip. This is important, I believe, because- Isn't it different, though? Because in Washington, where Brown was stopped, carrying a concealed firearm is presumptively legal, and it's not presumptively legal in California? Yeah, I understand that, Your Honor, and I did read your concurring opinion quite closely. I believe that presumptive lawfulness, such as that in Washington, is a data point, but I did not believe that it's determinative. And in fact, I looked at the majority opinion, or not the majority opinion, but the main body of the opinion, again, and presumptive lawfulness aside, it is still a crime in Washington, and the court cited a specific statute stating that it is illegal for someone to carry a firearm without a license. So there still was a crime there. The other thing that I want to bring to the court- Well, it wasn't clear whether he had a license, though, right? That is true, but the fact is, the presumptive lawfulness aside, it still is a crime, and I believe the court, again, in your concurring opinion, looked at some statistics, one being California being less than 2% or so, or less than 0.2%, having concealed firearm licenses, and Washington being a bit higher, at somewhere around 10%. That's still 90% of persons that don't have licenses and would be committing a crime by carrying a firearm. The other thing I think the court did in Brown, which is important on your question now, Jeff Freeland, is you distinguished Foster for the very reason that it was presumptive lawful in Washington. But I do want to bring to the court's attention that Foster, unlike the case here, the caller actually did observe firsthand the defendant brandishing a gun, and even then, in Foster, the defendant, after they came upon him, that they needed to ask him some questions about whether he actually possessed a firearm before he fled. None of those facts are extant here, and that's what I really want to get to, because I think this is what... I'm not sure I understand your point that none of those facts are here. Three customers said to the caller who identified himself, that they saw a man with a pistol on him. Why is that not relevant in looking at whether there's reasonable suspicion that he was committing a crime in a state where 499 out of 500 people don't have a permit to carry a concealed weapon? Your Honor, it's certainly relevant to the police duty to investigate. However, and I think Brown makes this clear, I also think both Florida v. JL and Terry Crespo make this clear as well, that you need actual... The police need to be able to talk to somebody prior to them developing reasonable suspicion to corroborate the fact that there was illegal activity afoot. In this particular case, the 9-1-1 caller was relying on information from third parties who were not talked to by the police or interviewed until after they affected the arrest of Mr. Vanderbilt. Does it matter at all in your view that the 9-1-1 caller said he's running? I think he knows. Is that an irrelevant statement in terms of the exigency of wanting to conduct the inquiry and the whether that constitutes a reasonable and articulable suspicion? Is that statement irrelevant? Well, number one, Your Honor, I think I need to address your use of the term exigency. I'm not sure that the fact that somebody that does not personally know that a person is carrying a gun saying, I think he's running, gives the police any additional information. All it does is describe what a person is doing. Well, he didn't say he thinks he's running. He said he is running. Well, I'm sorry. He is running. I think he knows. Okay, yeah, I'm sorry. Yes, he is running, but he doesn't have any specific knowledge about whether this person has a gun or not. So it certainly is relevant to the police officer's duty to investigate, but it does not rise to the level of reasonable suspicion until the police are actually able to corroborate with somebody that does have first-hand knowledge whether the person does or does not have a gun. But wouldn't the person have gotten away by that point? I mean, these are three patrons who told the employee they saw him with a pistol on him, and then the person telling the police he's running. I think he knows, which I think it's reasonable to interpret, as I know we've called the police. I don't understand why the three patrons telling the manager or whatever his title was that they saw this person with a gun on him. I don't understand why that's the same as an anonymous tip. Well, I believe that's precisely the discourse holding in Brown, is when you have somebody telling somebody else I saw this person with a gun, and by the way, this is not just Brown. This is also the same as this court's unpublished decision, Hollingwest. Almost very, very similar factual circumstances. A third party telling a 9-1-1 caller that a person has a gun. We didn't have three people telling them. I mean, are you arguing that it makes no difference if there are multiple identical reports through which the tip is filtered through someone who has identified themselves? It seems like the fact that there are multiple people reporting to the person who called makes some difference, doesn't it? Well, again, it is relevant to the police's duty to investigate, and if nothing else, you know, when you have the dispatcher telling them that the 9-1-1 caller is on the line, they have identified who this person is, but, you know, there was no fighting involved. I mean, there are a number of circumstances that were broadcast to the police officers that were responding. The fact that there may have been three people who said it, again, it is relevant to their duty to investigate. If anything else, or if nothing else, what it should have done was require the officers to send somebody to the site of the club and try and track these people down before they decided to do this high-risk stop, pull Mr. Van der Groen out of his, or order him out of the car at gunpoint, lying down, handcuffed, and insurgent. And what would that have accomplished? I mean, if they had just gotten the names of the three people, then would they have the suspicion to stop the car? I mean, I'm not sure what they would have learned from the three people that was more than what they already had. Well, what they would have done is been able to buttress the regional suspicion that they would have to conduct the stop in the first place. I mean, that's one of the things the court makes clear, is anonymous tips have to be reliable. Otherwise, you know, if you take that away, you could have two or three anonymous tips reporting the same thing, and police officers always claim regional suspicion, even though they don't have the opportunity to confront the person, assess their means of knowing, assess their accuracy, assess their reliability. All the factors that the courts have made clear since Florida versus J.L. are absolutely a prerequisite to finding regional suspicion. But the court has treated, like, 9-1-1 calls are more reliable because you could figure out who the caller was and talk to them later. But there's no requirement that the police go find the person and talk to them before they make the stop. So I'm a little confused about how this lines up, what you're arguing lines up. Well, what I'm saying, Your Honor, is I'm not saying it's necessarily the sine qua non, but it's definitely one of the factors that the courts look to is that ability. In this particular case, the police could have done a number of things short of engaging in a type of high-risk stop that they engaged in, you know, pulling Mr. Vandergaard over on and pulling guns on him under no more than some person reporting by a 9-1-1, granted, but reporting only what he, information he had received secondhand and had no basis and no first-hand knowledge of himself. Now, one of the things that I think is critical here is that the the court seemed to focus, my favorite court, the district court in this case, seemed to be focusing on the idea that this involved a gun rather than, you know, specific legal activity. Jail specifically held that there was no gun exception to the Fourth Amendment. I mean, the Supreme Court has really acknowledged the fact that, yes, guns are dangerous and that puts police on a heightened state of alert, but that does not mean that they don't have to comply with the strictures of the Fourth Amendment. And in this particular case, you know, the government in its brief has cited to any number of different penal code sections, which potentially, you know, could have justified the officers of acting the way that they did, but as we stated in our brief, none of those line up. And, you know, I say this because even the district court felt that this was a close case on reasonable suspicion. I believe that had she had the benefit of Brown's reasoning and Brown's analysis, that this case would have gone a different way. Now, with respect to the the 9-1-1 fact, again, the cases that the government are relying on, such as Navarrette, Terry Crespo, those were all called by victims themselves. They had first-hand knowledge. They had been threatened themselves. That did not exist in this case. And if nothing else, the tenor of the dispatcher's call, I think, is relevant as well, because the caller said there was no four and five. In other words, dispatcher told the police officers there was no fight involved. All we have here is somebody that can identify a determinate person who is leaving the scene in a black Crown Victoria. This seems to be me, seems to me to be nothing more than precisely what the Supreme Court in Florida v. JL said was insufficient. That is, the information does no more than identify a determinate person. Now, we also believe that the not only was the stop itself not permitted by the Fourth Amendment, but we also believe that the manner in which the police acted during the stop elevated this from just a regular Terry stop to an arrest. We cited the Washington v. Lambert case for the proposition that the reliability of the tip also informs whether the subsequent police conduct is appropriate under the circumstances. And we believe that given the fact this tip was effectively anonymous under the compulsion of Brown renders the police subsequent conduct an arrest rather than just a Terry stop. I believe it was Sergeant Colvin that stated that he determined that it was important to do a high-risk stop, which in this case, I'll remind the court, involves I think at least four police officers and a canine, that is a police dog, to affect the detention or the arrest of Mr. Vandegroen. He made that decision based on his belief that Mr. Vandegroen had brandished a gun. And again, here we refer to the record where the district court said, well, you know, the evidence in the record before the court during the hearing was that there was no brandishing at all. Nobody actually had said that he had brandished a gun. And the information that they received from the 9-1-1 caller that he observed Mr. Vandegroen lifting up his shirt and exposing a gun was actually obtained after Mr. Vandegroen had been arrested and he was subsequently interviewed. So the court and the government should not be relying on that information in determining whether this was a lawful course of conduct by the police officers. With respect to the path search, the same result obtained, we believe. The tip was anonymous. Terry requires reasonable suspicion of being both armed and dangerous and nothing in the tip, and when I say the tip, I'm speaking of the information was funneled to the police officers through a person that did not have any firsthand knowledge. Nothing in that tip pointed to any kind of dangerousness at all. The dispatcher said no 415, no fighting. So, although Mr. Vandegroen did complain, which is something that the government seizes on to show that he was uncooperative, he did nothing to threaten the officers. He was handcuffed prior to being path searched. And even then, the police found nothing, which takes me to my third point. Counsel, I just wanted to remind you that you had asked for time for rebuttal, but you've used up everything but a minute. Do you want to save some time? I do, Your Honor. Thank you for reminding me. I got a little carried away. No problem. I'll give you two minutes for rebuttal. Thank you. Good afternoon. May it please the court. Alexis Loeb for the United States. This case is about more than just a tip that a man had a gun. The defendant brought a gun to two night spots in a downtown area on a Saturday night in California, where carrying a gun in any variety of ways is presumptively illegal. At least three people saw the defendant with a gun and were concerned enough to report it to someone with a position of responsibility at one of the night spots who called the police. That caller identified himself, watched the defendant go into a second bar, leave, and suddenly take off running. And then he pointed the police, who had started following the wrong car, to the defendant. There was reasonable suspicion to stop the defendant, and officer safety concerns justified the tactics used during the police stop. I'd like to start by discussing the call to the police. The call created reasonable suspicion, both because it was sufficiently reliable and because it was indicative of illegal activity. There are at least nine reasons why this call is reliable. It was a recorded call that led to an immediate police response, similar to a 911 call. A witness, too, provided a detailed description of the defendant, not only describing the defendant in his clothing, but also pointing the police to the defendant's car after they started following the wrong car. The caller fully identified himself, his name, callback number, his position at the bar. And in addition, he narrowed the class of informants, not just by identifying himself, but also by explaining that the people who had seen the defendant with the gun were patrons, customers at the bar who had seen the gun, allowing the police to find them later. A witness, too, also provided the basis for his knowledge and the patrons' knowledge, which was that he had a position of responsibility at the bar, and the patrons had reported to him that they had seen the defendant with a pistol. This call was also more reliable because the witness, too, was reporting... Sorry, did you say the police would be able to find the patrons and identify them later? I'm not sure I understand how that would have happened. Well, in fact, that is what did happen. The FBI later did find witness one, and they can do that because they were able to go back to the bar, talk to the owner, talk to witness two, and talk more about and investigate who had been at the bar that night and ask witness two who those patrons were. They wouldn't have known that at the time, though, would they, that they would be able to do that later? I think the fact that they were identified as patrons and witness two explained what his position at the car would indicate that the police, that they had an avenue of identifying who the patrons were, so that these weren't necessarily people who could just entirely escape accountability, which is the concern that the telephone tipped. And speaking of accountability, I think it's important to discuss another reason that this call was reliable and, in fact, was more reliable than the call in Brown. And in addition to the fact that you have a report that three people, not just one person, saw the defendant with a gun, you have the absence of any indication that anyone was refusing to talk to the police, that anyone didn't want to be held accountable for the information they were providing. And that's different from Brown, where the eyewitness said that she didn't like the police and, you know, didn't want to be contacted. You don't have any indication of that reluctance here. Instead, what you have is witness two essentially aggregating the tips he heard, aggregating the reports that he had gotten from multiple people. And in that situation, I think it's highly impractical to require someone placing a call in this kind of situation to then rattle off the names and contact information of every person who has reported the illegal activities to him. And then to go back to the factors establishing reliability, I'd also like to point out that witness two provided the direction of the suspect's travel, which the police then confirmed when they stopped the defendant who had been going in the direction that witness two indicated, as in Navarette and Foster. And then finally, the narrating the defendant's flight. And I think if you listen to the recording, you'll hear, especially if the defendant is fleeing, that his voice has that kind of sense of urgency that courts have found suggests that a caller is more reliable. The tip was also indicative of illegal activity for several reasons. As the court pointed out, carrying a concealed weapon in California is presumptively unlawful, and the court should heavily consider the fact that this was a crime that occurred in California. But I'd like to make a couple more points about that issue. First of all, the police at the time don't need to identify the precise statute that's been violated. They just need to have some basis to believe that criminal activity is afoot. And while carrying a concealed weapon is presumptively unlawful in California, there are also several other crimes that were implicated by witness two's call. It's a crime to carry a loaded weapon in public or in a car. And in addition to carrying a concealed weapon, it's also a crime in California to openly carry a weapon. If it's a crime to Just in your brief that openly carrying would have been innocent conduct. I was surprised by that. So it sounds like you're correcting that Yes, Your Honor, an open carrying a gun on a holster would mean that one had not violated the concealed carry law, but it would still be a violation of the open carry law. So there We've also we also mentioned that There is in California, of course, also a law against brandishing a weapon. And, you know, one more law that I'd like to point out is that California law specifically authorizes the police to stop someone and examine a firearm to determine if it's loaded. And that's Penal Code section 25850B. And in the Foster case, Foster looked to that existence of that statute at footnote nine and found that that statute was further evidence that the Constitution permitted a stop of the defendant. So in addition to the Stop was an arrest. Yes, Your Honor. The stop was not an arrest because as the district court found the the it occurred under circumstances justifying officers fear for personal safety. And Washington v. Lambert, which defendant mentioned noted that where suspects are uncooperative or where a threat to officer safety exists more intrusive techniques do not mean that a defendant has been arrested. In Edwards So is the is just the the likely existence of a gun here. Does that mean so basically whenever the police are investigating the possibility of a gun. They can come with weapons drawn and all of the levels of force that were used here. No, Your Honor. I think the circumstances here are slightly different. And that's, I'd like to discuss that both in terms of the police. tactics used here the intrusiveness of those tactics and also in terms of the specific criteria that I think justified the tactics that were used here so Starting with the intrusiveness of the stop. I want to point out to the court that the escalation of the stock here actually was Was really quite gradual, particularly under the circumstances which are a traffic stop late at night. So the stop starts at about 1131 and the officers don't all immediately arrive with guns blazing and handcuff the defendant and put them in the patrol car. Instead, they wait several minutes to give him an opportunity to respond. So not only do all the officers not arrive at one But, but you can see at ER 53 they requested the dog and they've noticed that the subject is uncooperative and on the radio recording. You can hear them say that He, the suspect is not cooperative with commands. We're going to pause until the dog gets here. So then they pause and In what respect was he uncooperative? The, the, he was he was yelling and Officer cold and noted that he was it seemed that he was trying to to distract the officers, which is The same factor that the court this court look to and it's opinion in the Haney case to find that a suspect was uncooperative that the officers impression that that He was yelling and trying to distract him. And he also was refusing to obey the command to raise his hand. And in fact, he was lowering his hand. So the, the officers would pause for the dog to get up there and then they didn't approach the defendant and handcuff him until it was sometime between 1137 and 1139 and that's the ER 43 and 46 so that's The stop again has started at 1131 so this is six to eight minutes into the stop only then do they approach the defendant and handcuff him. And after that they they find the gun at 1142 which brings me to another point, which is that the stop the the detention here the duration Before they find the gun is quite short, which under Washington versus Lambert is something the court can consider the defendant is handcuffed here for Somewhere between three and five minutes and the gun is found just about 10 minutes after the stop started the officers have guns pointed at him the whole time he was handcuffed. Your Honor, I believe after the defendant was handcuffed. He was moved to the patrol car. So the officers wouldn't then he is first and move to the patrol car. So I don't believe the officers would have kept pointing their guns at him in that situation. So, but between when they as they handcuffed him and moved him to the patrol car. He was a gunpoint. Your Honor, I don't know if during the time period when he was being had been handcuffed and being walked to the patrol car. If at that point, the officers lowered their guns. And just one more point I want to make it that the the intrusiveness of the stop before I address the justification is that the the escalation here. Was also within keeping with the protocol or with the Concord Police Department protocol for high risk stop My colleague mentioned that it was officer Colvin who decided I believe officer Colvin explained in his declaration. Why he believed the high risk stop was necessary, but it was actually a more senior officer, the watch commander, a lieutenant make who made the decision that it was warranted. And this is discussed and the, the, the high risk stop protocol is also discussed at your seven 843 and 57 and and this just matters to point out to the court that this is not A random rash officer impulse. This is a stop that's conducted in accordance with department protocol as decided by a more senior officer. Turning to the justification for the stop judge Friedland, as you pointed out, there was information that the defendant had a gun that and that was information that at least Three people had seen the gun and under Edwards and Washington be Lambert. That is a factor that the court certainly certainly should consider and that that is the source of danger. It's also true that this case involved a high risk traffic involved a traffic stop late at night and traffic stop the court has recognized is Traffic stops are a situation that are really fraught with dangers to the officer. There was also. And I think this is something that differentiates this case from some of the other cited in the government's brief even The, the officers had a high degree of specificity, indicating that the defendant was a suspect. So that was, excuse me, was the suspect. Who was thought this is another factor under Washington be Lambert that the court can consider when a student just describe the suspect in In detail, he pointed the police to the defendant car and provided the direction of travel and that differentiates this case from other cases like miles and Edwards aware Even in those cases, the court found that there was no arrest. But in those cases, you might you had a suspect that matched. Perhaps a more general description was found in the vicinity. You didn't have that kind of specific identification that made these that gave these officers high degree of certainty that based on the tip of the defendant with arms. The lack of cooperation is also something that this court has recognized can be considered and I've already mentioned the several places in the record where it was found that a defendant was not cooperative was not obeying command on the mat increases the risk to officers. And I'd like to also point this case, the court specifically to its decision in the Haney case, which is cited at page 41 of the government's answering brief, which also involves a stop based on a suspicion that individuals were carrying guns. There the driver who did not match the description of the suspect began yelling and it seems like he was trying to distract the officers and he was also frisked he was handcuffed for a longer period of time. And his car was searched and they are the court found that the report of men with guns and Haney's non compliance justified the tactics used during the stop and that this and the stock did not amount to an arrest. To want to say anything about the right. Hey, Fisher. Thank you, Your Honor. This I'm ready. I believe that Benamor squarely controls the outcome of this case. Just as in Benamor defendants criminal record makes abundantly clear that he had full knowledge of data and that's established through Various facts, but it's in part is established through the PSR and the PSR description of defendants criminal history, which Was a part of the part of the stipulated facts on which the court made its decision. No, Your Honor. That was not part of the the fact before the court at the time of the stipulated back bench trial. The, but those are similar facts as the court and the court this court look to in Benamor to reject a defendant's claim under rate Heidi and I, I pointed out that they're in the PSR also because The defendant at sentencing never contested those prior convictions or the fact that He had been sentenced in each to more than a year and that he had in fact served more than a year in prison and he would have had an incentive and sentencing. To correct those facts. If those had been wrong. And I think. And in addition, I think it also illustrates that The, the kinds of facts we're looking at here are our prior convictions and length of sentencing and amount of time served me. These are facts that are essentially judicially noticeable. And so I think that particularly and that I would also say that Vanderbilt has even now he hasn't contested those facts. He has not offered any explanation as to how He might not have actually known that he was a felon, nor could he particularly given that one of those convictions. Was for being a felon in possession of a firearm and it occurred less than two years before this before this offense. Did and I think under the Supreme Court case in Johnson that matters because in Johnson in rejecting a plain error claim. The Supreme Court noted that the defendant did not contest the issue there. It was materiality at trial or on appeal. So I think here. Similarly, We look and we see that the defendant has never contested knowledge of status could not validly contest knowledge of status on these facts and I think it makes it abundantly clear that you can't satisfy the plain error test. As described in Johnson and then more recently as applied in very similar facts in the Benamor case in this court. If there are no further questions I asked the court to affirm Vanderbilt's conviction. Thank you. Thank you counsel and the other side has two minutes for rebuttal. Thank you, Honor. Very quickly, I'll respond to a couple of points the government's made. We're not asking for any burden undue burden to be placed on callers to 911 in terms of locating witnesses. The question remains and has always been what information do the police actually have before they engage in the conduct to think is appropriate to the investigation. With respect to the number of crimes that the government has pointed out to this panel in support of the opposite action. I do not recall them raising 25805B Anywhere in their briefing. So I'm not sure that this panel ought to be considering additional crimes that might have been available to the officer to detain or arrest Mr. Vanderbilt for they were neither briefed nor Raised in the district court with respect to The path search of the car. The one thing that I wanted to point out to the court is again the reliability of the tip is determinative on what the police may do with respect to a path search of a car. I believe that Michigan long still controls in terms of the Immediate access to a firearm. And again, in this case as the district court noted Gant doesn't really answer the question. She had to go outside of the circuit. To come up with the Griffin case. But again, Griffin. Involved a an informant that was quite reliable because the police officers interviewed him and he was actually the person that witnessed the Defendant who was arrested in that case with a firearm. Turning finally to the brief hate issue. I just wanted to stress for the court that number one. The fact or the any evidence of Mr Vanderbilt and knowing he was a felon was not part of the stipulation. This case. We are raising this on a sufficiency of the evidence standard, which I believe is different and distinguishes kiss. Excuse me, distinguishes our case in the cases that the government site. We do not believe it will be appropriate under better more to go to an extra record examination of Mr. Vanderbilt priors. The fact remains that the government and it is their burden did not introduce any evidence that Mr Vanderbilt at the time he committed this crime. Was aware of the status of the felon. That was a shortcoming in the presentation to the court and for that reason. And for the reasons raised our 28 day letter. We believe that the repeat air both for structural as well as sufficient the evidence grounds warrants reversal in this case. Thank you both sides for the very helpful arguments. The case is submitted and we're adjourned for the day. Thank you. Thank you. This court for this session stands adjourned.
judges: Friedland, Bennett, Rakoff